# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**DWIGHT GONZALEZ-IRIZARRY**,

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Civil No. 16-2996 (BJM)

## OPINION AND ORDER

Dwight Gonzalez-Irizarry ("Gonzalez") seeks review of the Commissioner's finding that he is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Gonzalez contends the Commissioner's decision should be reversed for lack of substantial evidence and failure "to deploy correct legal standards" because the hypotheticals the administrative law judge ("ALJ") provided to the vocational expert ("VE") did not convey all of the plaintiff's limitations. Docket Nos. 1, 20. The Commissioner opposed. Docket No. 21. This case is before me on consent of the parties. Docket No. 7-8. After careful review of the administrative record and the briefs on file, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401

(1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other

work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Gonzalez was born on October 12, 1975, has a 10th grade education, does not speak English (only Spanish), and worked in the pharmaceutical industry as an industrial mechanic/machine operator (medium work) for sixteen years. Social Security Transcript ("Tr.") 21, 38, 65, 499, 546, 548. On February 22, 2012, Gonzalez applied for disability insurance benefits ("DIB"), claiming to have been disabled since April 25, 2011 (alleged onset date) at 35 years of age[1] due to severe bilateral carpal tunnel syndrome, bilateral nerve entrapment neuropathy, bilateral neural foramina stenosis, posterior and central disc bulge in the cervical area, cervicodorsal myositis, and discogenic disease in the thorax and lumbosacral areas. He had no mental conditions. Tr. 18, 79, 365-366, 499, 547, 550. He last met the insured status requirements of the Act on December 31, 2016 (date last insured). Tr. 18, 516. The claim was denied initially and on reconsideration. Tr. 79, 365. A hearing before an ALJ was held on March 9, 2015. Tr. 32-72. On April 13, 2015, the ALJ found that through the date last insured, and considering Gonzalez's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Gonzalez could perform, and he was therefore not disabled as defined in the Act. Tr. 26-27. Gonzalez requested review of the ALJ's decision, and on October 4, 2016, the Appeals Council

---

[1] Gonzalez was considered to be a younger individual (Tr. 26, 365), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

denied Gonzalez's request, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-8, 11. The present complaint followed. Docket No. 1.

*Treating physicians*

    *Clinica Española, Inc.*

The legible evidence from Clinica Española, dated April 26 to 28, 2011, shows that Gonzalez had severe lumbar pain, was prescribed a muscle relaxant (Norflex), and that his condition improved upon discharge. A lumbar spine x-ray dated April 26 showed a muscle spam and discogenic changes at the L5-S1 level. Tr. 610-611, 617, 622.

On June 8, 2011, Dr. Emigdio Iñigo Fas ("Dr. Iñigo"), medical director of the clinic, informed the SSA disability examiner that Gonzalez was hospitalized in April 2011 due to severe cervical and lumbar pain with compressive radiculopathy. Gonzalez had cervical and lumbar discogenic disease, chronic degenerative changes of cervical spine with foramina stenosis, generalized degenerative changes and osteophyte formations, and deviation of the cervical spine. Gonzalez was treated with analgesics, muscle relaxants, non-steroideal anti-inflammatory drugs, and steroids without clinical improvement. Tr. 623. Dr. Iñigo opined that Gonzalez's conditions limited or interfered with his daily living activities, and that he was disabled to work. *Id.*

    *State Insurance Fund ("SIF")*

Gonzalez was treated under the auspices of the SIF from 2009 to 2015 for hands, neck, and lower back conditions due to work injuries. Treatment included medications, physical therapy, and hand surgery, and he was discharged with disability compensation. Tr. 498, 504-510, 608, 624-813, 825-875.

Treatment notes and tests from 2009 and 2010 indicate that Gonzalez suffered from neck and lower back pain, and a cervical strain. Tr. 131-136, 140-142, 628-633, 637-639. A cervical spine x-ray dated June 10, 2009, showed a muscle spasm, and chronic deformity of the C5 and C6 vertebral bodies with slightly decreased disc space. The lumbosacral spine x-ray also suggested a muscle spasm, and showed narrowing of the discs spaces at T12-L1 and at L5-S1 levels, with a slight wedge chronic deformity at the T11 and T12 levels. Tr. 640-641. An electromyography ("EMG") of the upper extremities performed on September 10, 2009 showed bilateral median nerve entrapment neuropathy. Tr. 139, 636. A magnetic resonance imaging ("MRI") of the cervical spine dated September 24, 2009 showed straightening of the normal curvature, generalized osteophyte formations and disc desiccation, generalized hypertrophy of the apophyseal joints, mild

posterior disc bulges with canal stenosis and bilateral neural foramina stenosis at the C4 to C7 levels, and central disc herniation at the C4-C5 level. Tr. 634.

Notes from 2009 prepared by nurses and physical therapists indicate that Gonzalez felt moderate to intense neck and lower back pain, and that moving his head alleviated the pain. A doctor diagnosed cervical, dorsal, and lumbar strain, and referred Gonzalez to the pain clinic. Medications were prescribed. Tr. 173-174, 185, 677-678, 687, 689. At physical therapy in August 2009, Gonzalez indicated feeling cervical and lumbosacral pain, accompanied by cramps and a stabbing sensation. The pain started when he stayed in the same position for a long time, and it would spread to his chest, shoulders, and legs. It affected his sleep and ability to sit, stand, and walk. The therapist noted that Gonzalez felt persistent pain upon palpation of the cervical area, but that pain had decreased in the lumbar area. The therapist also noted that Gonzalez had good postural responses and tolerated sitting, standing, and walking. Tr. 175, 179-180, 679, 683-684. In September, he was observed walking with some difficulty. Tr. 174, 678.

Nurse's notes from 2010 show that Gonzalez felt moderate neck, shoulder, back, and hand pain. He was observed with limited neck movement, and walking without difficulty. Medications and physical therapy were prescribed, and he was referred to an anesthesiologist for nerve blocks. Tr. 163, 171, 667, 675. Gonzalez was discharged with disability benefits. Tr. 160, 664. In August, light inflammation was observed in his right wrist's joint, and he was ordered to wear a wrist brace. Tr. 222-223, 727-728. Physical treatment notes from October and November 2010 show that Gonzalez continued feeling pain despite being treated with physical therapy, and that it was affecting his social life and ability to work. Goals were set to increase Gonzalez's range of motion and grip strength between ten to twelve pounds in the wrist area with physical therapy and at-home exercises. Tr. 204-205, 208-210, 708-709, 712-714. December progress notes indicate that discomfort and numbness persisted in his hand, that he had tendinitis, and was prescribed anti-inflammatory medication and a muscle relaxant. Tr. 213-214, 717-718.

Progress notes from January to December, 2011 indicate that Gonzalez felt moderate pain and numbness in his hands, and reduced grip strength in his right hand. Notes from April 26, 2011 (the day after his alleged onset date in this case) indicate that Gonzalez felt intense lower back pain and pain upon palpation, and was limited in movement in the lumbosacral area. Tr. 130, 627. A June physical therapy progress note indicates that the pain could be described as generalized, cramps, numbness, pins and needles, intermittent, and chronic, and that it interfered with his ability

to sleep, drive, and work. Tr. 300, 805. A lumbar spine MRI dated October 11, 2011 revealed generalized osteophyte formations and disc desiccation at the L3-S1 levels, and narrowing of the disc space with abnormal signal intensity of the endplates. Tr. 741. An EMG and a nerve conduction velocity ("NCV") study of the lower extremities tendered normal results. Tr. 740. An evaluation by a SIF doctor, dated October 25, 2011, shows that Gonzalez felt persistent moderate pain in the cervical area and left hand, and was diagnosed with cervical strain and left hand tendinitis. Tr. 256-259, 761-764. In November, tests revealed that Gonzalez had limited cervical range of motion and bilateral carpal tunnel syndrome. He had positive Tinel's, Phalen's, and Durkan's tests on both hands. Gonzalez was prescribed a splint for his hands, started receiving physical therapy for his hands and wrists, and was evaluated by a hand surgeon. He also felt that his feet would go numb. Tr. 238, 254-255, 279, 292-308, 743, 759-760, 788, 797-813.

Progress notes from 2012 show that Gonzalez felt moderate pain in his neck, hand, lower back and foot, and felt hand numbness, but presented no limitation when moving his neck as per a nurse's observation, or difficulty while walking. Tr. 231-232, 234, 249, 251-252, 736-737, 739, 754. 756-757. In February, Gonzalez's lumbar area pain was 6 on a scale of 10 (upper end of the moderate pain interval). He felt intense pain upon deep palpation, and moderate pain when performing range of motion. Tr. 228-229, 733-734. In March, he felt light pain in the lumbar area when subjected to deep palpation and while performing ranges of motion, but felt some relief in regards to the pain. Muscle tone was normal, and there was no deformity. Gonzalez showed good postural responses and tolerance (he scored the maximum tolerance of 11-30 minutes) to sitting, standing, and walking. Tr. 224-225, 729-730. Gonzalez was granted disability on April 19, 2012 due to lumbar myositis. Tr. 504. In May, the lumbar pain was at 4 out of 10 (lower end of the moderate pain interval). Tr. 228, 733. An MRI of the cervical spine, dated May 4, 2012, showed generalized osteophyte formations, disc desiccation, and narrowing of the intervertebral discs spaces at C5-C6 and C6-C7 levels; hypertrophy of the apophyseal joints; moderate-sized posterior disc bulge with central canal stenosis and bilateral neural foramina stenosis at the C3 to C7 levels; central disc herniation at the C4-C5 level; and a large posterior disc bulge and central disc herniation with minimal anterior compression of the cervical cord at the C6-C7 level. Tr. 751. On July 5, 2012, Gonzalez was discharged for cervical and lumbar pain. Tr. 239, 744.

Gonzalez had left and right hand carpal tunnel release surgeries performed on May 14, 2012, and May 8, 2014, respectively. Gonzalez received physical therapy after both operations.

Tr. 242, 331-332, 339, 747, 848-849, 856. Progress notes from June 19, 2012 indicate that Gonzalez had excellent range of motion in the left hand, and an x-ray of the left hand, dated July 31, 2012 was normal. Tr. 768. On September 20, 2012, Gonzalez expressed feeling mild pain (two out of a scale of 10). No cervical, thoracic, or lumbosacral pain was present (the boxes for "No" were check-marked in the category belonging to pain), and his inferior extremities were normal. That day, the hand surgeon discharged Gonzalez. Tr. 240, 745. By June 2014, the right hand injury had also healed well, but July physical therapy notes indicate that Gonzalez still felt mild pain in his right hand, moderate pain at palpation, hypersensitivity in the palm area, limited right hand range of motion, and diminished ability to grasp. He had no muscle spasm, and was observed walking without difficulty and with a normal gait. Tr. 331-334, 337, 848-851, 854. By August 20, 2014, Gonzalez had completed physical therapy for his bilateral carpal tunnel syndrome, and had improved. Tr. 328, 845. On August 28, physical examination yielded normal results, including the superior and inferior extremities. Tr. 326-327, 843-844.

Progress notes from 2014, and January 2015, show that Gonzalez still complained of mild to moderate lower back pain, but physical examinations returned normal results (including of the superior and inferior extremities). An MRI of the cervical spine, dated April 26, 2014, showed discogenic disc disease changes in Gonzalez's C5-C6 and C6-C7 levels. Disc bulges were present at the C4 through T1 levels, more prominent at C6-C7. There was no central spinal canal stenosis or narrowing of neural foramina. The lumbar MRI, also performed that day, showed that Gonzalez had discogenic disc disease changes at the L3 through S1 levels. An L5-S1 disc bulge produced a moderate impression upon the thecal sac and mild narrowing of neural foramina. Associated posterior facet joint degenerative changes were also present. Tr. 826-827, 873-874. In June and August 2014, Gonzalez was observed walking without difficulty; in October 2014, with difficulty; while in January 2015, the nurse observed him walking without difficulty. He was prescribed medications. Tr. 326, 342-347, 351-355, 843, 859-864, 868-872.

Dr. Jose Montañez Huertas ("Dr. Montañez"), spine orthopedic surgeon, also evaluated Gonzalez. Notes from April and May, 2014 and August 6, 2015 show that Dr. Montañez examined Gonzalez, had various tests performed, and recommended L5-S1 surgery (nervous system recompression and function) to correct herniated degenerated disc and swollen nerve conditions. Tr. 309, 360-362, 825, 866-867, 869, 877-880. Surgery was performed on September 29, 2015 for decompression fusion and instrumentation l5-S2 transforaminal interbody fusion with peek cage

and bone graft. He was discharged on October 1, with a follow-up appointment in three weeks, and a request for home equipment, such as a position bed, bathroom and shower equipment, and a wheel chair. Tr. 359-360, 875-877.

*Procedural History*

After applying for disability benefits on February 22, 2012 (Tr. 499), Gonzalez submitted in March a disability report stating his conditions (Tr. 546-554), and a function report regarding his daily activities and how his conditions limited his activities. Tr. 93-100, 557-564. He claimed that his back pain affected his ability to get up, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use his hands, and complete tasks. He could walk for fifteen minutes before needing to stop and rest, and had to rest for fifteen minutes before resuming walking. He had no issues paying attention and following written and spoken instructions. Tr. 98, 562. His home routine included getting cleaned up, eating, taking his medications, and watching television all day. He could not remain in one position for long and had to shift positions every ten to fifteen minutes because of back pain. He also wore prescribed wrist braces to sleep, but did not sleep well because he felt a lot of pain, cramps, hand numbness, and heat, even while medicated. He needed his partner's help getting dressed. Tr. 93-94, 97, 99, 557-558, 561, 563. He was able to prepare his own meals, but his partner would prepare meals when he was not able to get out of bed. He could not do house and yard work due to back pain that extended to his right foot. He could drive (only to nearby places because of the pain), go out on his own, do shopping, attend medical appointments, and spend time with others. He was also able to handle money. Tr. 95-97, 559-561.

The case was referred for consultative examinations and RFC assessments. Tr. 369.

*Dr. Samuel Mendez ("Dr. Mendez")*

On September 7, 2012, Dr. Mendez prepared a neurological consultative evaluation. Tr. 814-824. As to Gonzalez's motor functions, Dr. Mendez found adequate bulk, no atrophy or spasm, and tender cervical and lumbar paraspinal muscles. Gonzalez's strength in all his extremities was 4 in a scale of 5, limited by pain. Lasegue test was negative. His range of motion in his back (extension and flexion, left and right), hip (flexion and backward extension), and knee (flexion) were also limited by pain. Straight leg raise test was positive on the left at 60 degrees. Tinel test was positive bilaterally. Pinpricking and proprioception were intact in all areas but mildly decreased in the hands. Gonzalez also had an unassisted gait, with no foot drop or limping. Tr. 818, 820. A roentgenological study showed normal left and right wrists. Tr. 816. Dr. Mendez diagnosed

chronic lower back and cervical pain, bilateral carpal tunnel syndrome, diffuse joint pain with no sign of inflammatory changes, and lumbosacral syndrome. Tr. 818-823.

### *Dr. Brenda Concepcion ("Dr. Concepcion")*

On October 15, 2012, Dr. Concepcion assessed that, based on the medical evidence, Gonzalez had a severe condition, but did not meet or equal a listing (Listing 1.04 Spine Disorders was considered). Tr. 371-372. Dr. Concepcion further found that Gonzalez's statement of pain at the lower back, neck, and hands was reasonable and supported by the medical evidence, but the degree of limitation was out of proportion to the objective physical findings. Tr. 371.

Dr. Concepcion assessed that Gonzalez could occasionally (cumulatively 1/3 or less of an eight-hour day) lift and/or carry (including upward pulling) twenty pounds; frequently (cumulatively more than 1/3 up to 2/3 of an eight-hour day) lift and/or carry ten pounds; stand and/or walk (with normal breaks) about six hours; sit (with normal breaks) about six hours; push and/or pull (including operation of hand and/or foot controls) unlimitedly other than assessed for lifting and/or carrying. Gonzalez could also occasionally climb ramps, stairs, ladders, ropes, and scaffolds; stoop; and crouch. He could frequently balance, kneel, and crawl. He could unlimitedly reach in any direction (including overhead), finger (fine manipulation), and feel (skin receptors), but was limited in both hands in his ability to handle (gross manipulation), which he could only do frequently. He showed no visual, communicative, or environmental limitations. Tr. 373-374.

The claim was denied on October 30, 2012, with a finding that Gonzalez could not perform past relevant work but that, as per his RFC, could do light work. Tr. 374-375, 377.

On December 3, 2012, Gonzalez requested reconsideration, claiming in his second disability report that, as of November 1, 2012, his conditions worsened. He felt a lot of pain in his upper and lower back. The pain extended to his arms and hands, and his hands would go numb and cramp up. He felt shooting pain in his legs. He could not bend over because his back locked up. He had to change positions constantly, and could not spend much time standing, sitting, or walking. He lost strength in his left arm, and could barely exert force or perform repetitive movements. His conditions affected his ability to shower because he could not bend over, and his wife had to help him wash his legs and feet. He needed help putting on and taking off shirts that went over his head. The only chores he was able to perform were washing the dishes and throwing clothes in the washer. Tr. 379, 383, 398, 567-570.

On December 11, 2012, Gonzalez provided a declaration, claiming that when he went to Dr. Samuel Mendez for a medical evaluation, as ordered by the Disability Determination Program, Dr. Mendez only asked him some questions for about five minutes, and did not examine him or perform any tests. Tr. 78, 397.

In a function report dated May 6, 2013, Gonzalez claimed that his upper and lower back conditions did not permit flexibility and repetitiveness of movement. His back would lock if he kept the same position more than fifteen to twenty minutes, so he shifted positions between the sofa and the bed. His hands and feet would cramp up, and he would not be able to walk, kneel, bend, squat, reach, or lift objects. He could not stand or sit for more than fifteen to twenty minutes. The pain, cramping, and numbness also impeded him from concentrating, being alert, and sleeping, and he could no longer drive, prepare his own meals, or pay bills that required standing in line. Tr. 101-108, 573-580. The medications made him sleepy and he could not be alert. He could not drive. He would watch television daily. His physical problems included stooping, crouching, standing up, walking, reaching, sitting, kneeling, climbing stairs, and using his hands. He also had problems getting along with others. Tr. 383.

**Dr. Pedro Nieves ("Dr. Nieves")**

On October 16, 2013, Dr. Nieves reviewed the evidence and the assessment made at the initial level, and affirmed it as written. Tr. 386.

The claim was denied upon reconsideration. The notice specified that the evidence was reviewed by a physician and a State agency disability examiner, that additional evidence was requested but not available, and that Gonzalez did not meet with Dr. Roberto Hau-Rosa ("Dr. Hau") for a consultative examination, as scheduled, and did not offer a reasonable excuse.[2] The SSA thus concluded that Gonzalez did not qualify to receive benefits, and that the initial determination was proper under the law. Tr. 79, 109, 383-384, 389, 399. The RFC for light work was adopted as written. Tr. 383.

Gonzalez requested a hearing before an ALJ (Tr. 402, 412), and submitted a third disability report claiming that his conditions had further worsened from the last report submitted in

---

[2] An appointment with Dr. Hau had been scheduled for October 7, and on September 19, Gonzalez, through counsel, had objected to the appointment of Dr. Hau because he was not qualified to adequately evaluate his musculoskeletal and/or cardiovascular conditions, and requested a medical consultation with another consulting physician. Tr. 109, 581. That request was denied for not complying with the criteria of requesting appointment with another medical consultant. Tr. 110, 582.

December 2012, and that he had developed new conditions. His neck and lower back pain extended to his shoulders and arms, and legs, respectively, and they would go numb and cramp up. He could barely bend over, had to constantly change positions, and could not spend much time standing, sitting, or walking. He lost strength in his hands and would drop things. He could barely exert force or perform repetitive movements. He also had difficulty turning his neck from side to side. Tr. 585.

A hearing was held before an ALJ on March 9, 2015. Gonzalez, Dr. German Malaret (medical expert ("ME"), "Dr. Malaret"), and Dr. Hector A. Puig (the VE) testified. Tr. 37-72.

Gonzalez testified that he has not worked since April 25, 2011, after injuring his back at work while doing heavy lifting. He used to work for a pharmaceutical company as an industrial mechanic, where he would assemble and disassemble machines, and replace heavy parts (80 to 100 pounds) every 15 to 20 minutes. Tr. 38-39, 44. He was placed on rest status but was then left without a job. He lived in a house with his partner. His pain affected his ability to walk, and his hands and feet would cramp up. Gonzalez could walk 15 to 20 minutes, after which he felt "like I want to die." He could also sit comfortably for 25 to 30 minutes. He explained that he could, for example, watch television, but that he needs to stand more than sit. He had difficulty boarding a vehicle, but could drive 25 to 30 minutes at a time before the pain in his back down to his knees would start. He could eat, read, shower, help with chores, and go to medical appointments, but could not wash his car, go to the gym, or go shopping. He also explained that when doing chores like cooking or mopping, his fingers and hands lock. Tr. 35-44. Gonzalez testified that the carpal tunnel syndrome surgeries did not help him. His hands would cramp up, he could not tighten his grip, and his fingers would lock. Tr. 45.

The ALJ asked Gonzalez if he could do sedentary or light work that did not require lifting heavy weight and where he could sit for the large part of the day. Gonzalez answered that he believed he could not because he would not be able to rest. Tr. 43.

The ME testified that he found evidence of cervical and lumbar discogenic disease (Gonzalez was a candidate for L5-S1 surgery), uncontrolled hypertension, bilateral carpal tunnel, and that Gonzalez was overweight. Tr. 45-48. The record showed that Gonzalez's carpal tunnel syndrome improved after both hands were operated on, and that Gonzalez had expressed that he felt well. Tr. 46. The ME found in the record contradictory evidence regarding his discogenic disease; a neurosurgeon opined in May 2014 that Gonzalez was a candidate for L5-S1 surgery, but

evidence from a radiologist dated April 2014 indicated that Gonzalez did not have that much discogenic disease. Tr. 47-49. The ME also testified that Gonzalez had a straight leg raising test positive for 60 degrees, and that result means that he does not have much of a back problem. Tr. 59.

The ME further testified that the applicable listing in this case was Listing 104A for the neck and lumbar area, and Listings 11.04B or 102B for the carpal tunnel syndrome, but that no one specific listing matched his condition. In his opinion, he would limit Gonzalez to light work occasionally with frequent rest; sit six to eight hours; stand and walk for six to eight hours; no climbing or lifting; climb ramps and ladders not frequently; frequently balance, kneel down, bend over, finger and feel, handle, and do heavy manipulation; and occasionally incline and crawl. Gonzalez had no manipulative limitations, and could lift his hands over his head and reach in all directions without limitation. The cold aggravates his pain, so he could only be occasionally exposed to extreme heat, cold, and humidity He could frequently be exposed to heights and vibration, and could frequently operate a vehicle or mobile mechanics. Tr. 53-56.

The VE testified that Gonzalez's previous jobs were machine operator and industrial mechanic (medium work). The ALJ asked the VE if a person with Gonzalez's work, age, academic, and vocational profile, and with the following limitations, could work: lift and carry twenty pounds occasionally and ten pounds frequently; sit for six hours out of an eight-hour work day; stand and/or walk six hours; push, pull, lift, and carry; frequently carry, finger, and feel with both hands; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, kneel, and crouch; occasionally stoop and crawl; with frequent exposure to unprotected heights, moving mechanical parts, operation of a moving vehicle, and vibration; occasional exposure to humidity, wetness, extreme cold, and extreme heat. The VE answered that such a person could do light routine jobs that could be learned by demonstration, such as inspection of missing parts, sorter or classifier, and ticketer. Tr. 66-67.

The second hypothesis asked if that same person, with the following additional limitations, could work: lift and carry ten pounds occasionally and less than ten pounds frequently; stand and/or walk for two hours out of an eight hour work day; and sit for six hours. The VE answered that such a person cold only do sedentary work, such as office support type work (addresser, documenter) or surveillance system monitoring. Tr. 68-69.

The third hypothesis asked if the same person as in the second hypothesis but with the following additional limitations, could work: manipulative limitations; occasionally reach overhead; frequently reach in all other directions; occasionally handle and finger; and frequently feel. The VE answered that with occasional handling in all directions, there would be no jobs that he could do. Tr. 69.

Counsel argued at the hearing that the examining neurological consultant, Dr. Mendez, did not have Gonzalez perform any tests, such as standing up, bending over, lifting his arms, or use his hands, to confirm Gonzalez's medical condition. Tr. 70-71.

On April 13, 2015, the ALJ found that Gonzalez was not disabled under sections 216(i) and 223(d) of the Act. Tr. 18. The ALJ sequentially found that Gonzalez:

(1) had not engaged in substantial gainful activity since his alleged onset date of April 25, 2011 through his date last insured (Tr. 20);

(2) had severe impairments: bilateral nerve entrapment neuropathy, chronic neck pain secondary to cervical degenerative disc disease, severe bilateral carpal tunnel syndrome, status post carpal tunnel release in both hands, chronic back pain secondary to lumbar discogenic disc disease, obesity, and hypertension (Tr. 20);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 20);

(4) could not perform past relevant work but retained the RFC to perform sedentary work, with the following additional limitations: he could lift and carry occasionally ten pounds and frequently less than ten pounds; sit for six hours, and stand and/or walk for two hours in an eight-hour work day; push and pull as much as he can lift and carry; frequently handle, finger, and feel with the hands, climb ramps and stairs, balance, kneel and crouch; never climb ladders, ropes, or scaffolds; and occasionally stoop and crawl. He could frequently be exposed to unprotected heights, vibration, and moving mechanical parts, and could frequently operate a motor vehicle. He could also be occasionally exposed to humidity and wetness, and extreme cold and heat. Tr. 21, 26.

(5) as per his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Gonzalez could perform (such as addresser, document preparer, and surveillance system monitor). Tr. 26-27.

Gonzalez requested review of the ALJ's decision, submitting evidence of back surgery, which occurred after the hearing before the ALJ. On October 4, 2016, the Appeals Council denied Gonzalez's request, finding that the new evidence dated after the ALJ's decision did not affect the ALJ's decision on disability had on or before April 13, 2015, and with instructions for Gonzalez to file a new claim for DIB if he wished to be considered for disability beginning on or before April 13, 2015, thus rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-8, 11. The present complaint followed. Docket No. 1.

**DISCUSSION**

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Gonzalez's age, education, work experience, and RFC, there was work in the national economy that he could perform, thus rendering him not disabled within the meaning of the Act. The ALJ determined that through the date last insured, Gonzalez retained the RFC to perform sedentary work, with additional limitations as mentioned above in the background section. Tr. 21. Gonzalez argues in general the ALJ's RFC determination was erroneous, only emphasizing that the ALJ should have further developed the record as to the gap left by Dr. Mendez's faulty evaluation, which the ME referenced in his testimony at Tr. 51. Docket No. 20, p. 2, 13.

While reading the ALJ's decision, I noticed that the ALJ described in length each treating, examining, and consultative opinion available in the record, and, curiously, assigned weight to all the opinions except to that provided by Dr. Mendez. I'm under the impression that the ALJ did not consider Dr. Mendez's opinion in reaching the step five determination because no weight was assigned to his opinion, having the ALJ noted that "[w]hile this examination reflects limitations in the claimant's hand strength, the exam was performed months after his left carpal tunnel release operation and prior to his surgery on the right hand." Tr. 25. Furthermore, if Gonzalez is concerned that the ME's testimony influenced the ALJ's determination, I consider that it did, to his favor. The ALJ gave partial weight to the ME's testimony because, while the ME found that Gonzalez had a modified light residual functional capacity, the ALJ concluded that a sedentary exertional level was more appropriate. The ALJ also gave little weight to Dr. Concepcion's assessment that Gonzalez could perform at a light exertion level because the record suggested a greater degree of physical limitations. And although the SIF treating sources concluded that Gonzalez was disabled, the ALJ pointed out that the SIF rules and regulations differed from those of the SSA, so little

weight was granted to that determination because it was inconsistent with the record as a whole. *Id*.

After thoroughly and carefully reviewing the record, I find that it contains substantial evidence to support the ALJ's RFC finding that Gonzalez could perform sedentary work, which requires lifting no more than ten pounds at a time, sitting for at least six hours out of an eight-hour work day, occasionally walking and standing for no more than about two hours a day, and having good use of the hands and fingers for repetitive hand-finger actions. 20 C.F.R. § 404.1567(a) & (b); SSR 83-10.

Gonzalez's medical record extends from 2009 to 2015, with evidence of Gonzalez continuously receiving medications, physical therapy, and surgeries to treat his conditions. While it appears that his conditions existed prior to his alleged onset date, were exacerbated by his 2011 work injury, and at worst, became permanent, the record as a whole still contains substantial evidence that shows that Gonzalez had the RFC to perform sedentary work, as determined by the ALJ. Looking at the SIF evidence, Gonzalez was continuously being treated for cervical and lower back pain. He received muscle relaxants, anti-inflammatory medication, nerve blocks, and physical therapy. After his alleged onset date in 2011, Gonzalez felt intense cervical and lower back pain and had a limited range of motion in the lumbosacral area, which interfered with his ability to lift, sit, walk, stand, and sit. Nurse's station notes indicate that, most times, Gonzalez was observed walking without difficulty and with a normal gait. Physical therapy notes show that, at all the appointments, Gonzalez had good postural responses and maximum tolerance to sitting, standing, and walking. An August 2014 physical examination yielded normal results of the extremities, although Gonzalez expressed feeling mild lumbar pain. Furthermore, Gonzalez testified that he still felt pain, which affected his ability to walk, but he could walk for fifteen to twenty minutes at a time, and sit comfortably for twenty-five to thirty minutes. He alternated between standing and sitting, and sedentary work does not require that a person be seated for six unbroken hours without shifting position during an eight-hour work day. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). Gonzalez had also reported in function and disability reports that he had to shift positions. For example, he could sit while watching television and stand for short periods of time. The pain gradually reduced to mild or moderate by 2015.

As to his hands, while in 2011 Gonzalez felt moderate pain and numbness, and reduced grip strength in his hands, by August 2014, the evidence shows that both his hands had undergone

carpal tunnel release surgery, the injuries had healed well, physical therapy was completed, and his condition had improved. However, Gonzalez also testified in 2015, and had so reported in function reports, that he could do some chores which required his hands, and help with others to a lesser degree, but that he felt that the surgeries had not helped him, and that he would still feel cramps, could not tighten his grip, and his hands would lock up. Based on the treating physician's 2014 notes that Gonzalez felt well in terms of his hands, the RFC assigned by the ALJ requires that Gonzalez be able to frequently handle, finger, and feel with the hands. The record points to continuous treatment and surgeries for Gonzalez's bilateral carpal tunnel syndrome, with documented improvement in his condition, but his statements of functionality and pain dated after the medical interventions conflicts with his ability to perform work at that assigned RFC pace. Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)), and based on the evidence contained in the record up to the decision date, I find that there is substantial evidence to support the ALJ's RFC finding that Gonzalez could perform sedentary work.

Gonzalez requested that this case be remanded to develop the record by having the ALJ elicit additional evidence to complement what he claims was a faulty consultative evaluation by Dr. Mendez, performed prior to the ALJ's decision. While the ALJ has a duty to develop an adequate record on which reasonable conclusions may be based, *see Heggarty v. Sullivan*, 947 F.2d 990, 998 (1st Cir. 1991), Gonzalez has not shed little light on what additional information might be considered that is not already contained in the record.[3]

---

[3] There is evidence contained in the record, dated after the ALJ's decision, which shows that a SIF orthopedic surgeon performed back surgery on Gonzalez. This evidence was not considered by the ALJ, and the Appeals Council, who did receive this evidence, denied review because it was medical information about a later time. Tr. 1, 6. "In such cases, the Appeals Council first determines if the submission constitutes 'new and material' evidence 'that relates to the period on or before the date of the ALJ's hearing decision.'" *Meyer v. Astrue*, 662 F.3d 700, 704-705 (4th Cir. 2011) (citing 20 C.F.R. § 404.970(b)). The Appeals Council properly advised Gonzalez to file a new application, as directed by 20 C.F.R. § 404.970(c).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 15th day of March, 2018.

*s/ Bruce J. McGiverin*    .
BRUCE J. MCGIVERIN
United States Magistrate Judge